**CLARKSON LAW FIRM, P.C.**
Shireen M. Clarkson (SBN 237882)
*sclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Alan Gudino (SBN 326738)
*agudino@clarksonlawfirm.com*
Kelsey Elling (SBN 337915)
*kelling@clarksonlawfirm.com*
Ryan Ardi, Esq. (SBN 348738)
*rardi@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN PRESCOTT, MARLEEN VILLARREAL, OMAR MASRY individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>ABBOTT LABORATORIES,<br><br>　　　　　　　Defendant. | Case No. 5:23-cv-04348-PCP<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, (CAL. CIV. CODE §§ 1750, *et seq.*)<br><br>2. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW, (CAL. BUS. & PROF. CODE §§ 17500, *et seq.*)<br><br>3. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)<br><br>4. BREACH OF EXPRESS WARRANTY<br><br>5. UNJUST ENRICHMENT/RESTITUTION<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page No.**

I.    SYNOPSIS ............................................................................................... 1

II.   JURISDICTION AND VENUE ............................................................... 13

III.  PARTIES ................................................................................................. 14

IV.  FACTUAL ALLEGATIONS .................................................................. 20

     A.    Background on Products and Product Claims ............................. 20

     B.    Plaintiff and Reasonable Consumers Were Misled by the Challenged Health Claims.................................................................................................. 35

     C.    No Adequate Remedy at Law ..................................................... 41

V.   CLASS ALLEGATIONS ........................................................................ 43

CAUSES OF ACTION ...................................................................................... 47

     COUNT ONE ......................................................................................... 47

     COUNT TWO ......................................................................................... 49

     COUNT THREE ..................................................................................... 50

          "Unfair" Prong ................................................................................ 52

          "Fraudulent" Prong.......................................................................... 54

          "Unlawful" Prong............................................................................ 55

     COUNT FOUR ....................................................................................... 56

     COUNT FIVE ......................................................................................... 57

PRAYER FOR RELIEF..................................................................................... 58

DEMAND FOR JURY TRIAL .......................................................................... 59

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Plaintiffs Steven Prescott, Marleen Villarreal, and Omar Masry, individually, and on behalf of all other similarly situated purchasers, as more fully described herein (the "Class"), brings this class action complaint against Defendant Abbott Laboratories. Plaintiffs' allegations are based upon personal knowledge as to themselves and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys.

## I.   SYNOPSIS

1.    Every day, millions of health-conscious consumers seek to make purchase decisions that align with their nutritional needs, and they trust food and beverage companies to advertise product attributes honestly.

2.    Informed choice is especially important to the ~150M (and rising) people living with diabetic conditions in the United States who necessarily depend on diet to manage their disease and live a longer life.[1]

3.    Diabetes is a chronic disease stemming from the body's inability to regulate blood glucose (sugar) properly. Diabetes is marked by metabolic and endocrine dysfunction, and overaccumulation of sugar in a person's blood.[2] Diabetes is a serious disease that can lead to further health complications, including mortality. In fact, diabetes is reported to be the eighth leading cause of death in the United States by the Center for Disease Control and Prevention (CDC), and the number of adults diagnosed with diabetes has more than doubled in the last two decades.[3]

4.    Abnormal blood sugar levels and the need for blood sugar management is not isolated solely to diabetics. About 98 million adults in the United States have prediabetes, a condition where blood sugar levels are higher than normal, but diabetes has not been diagnosed.[4] Both diabetes and prediabetes are diagnosed by measuring the level of sugar (glucose) in the blood. Prediabetes can be reversed by consciously managing blood sugar levels and reducing sugar intake to achieve

---

[1] *Diabetes Statistics*, DIABETES RSCH. INST. (2022), https://diabetesresearch.org/diabetes-statistics/.
[2] *How To Reverse Prediabetes*, CLEVELAND CLINIC (Sept. 13, 2022), https://health.clevelandclinic.org/how-to-reverse-prediabetes.
[3] *What is Diabetes?*, CDC, https://www.cdc.gov/diabetes/basics/diabetes.html (last visited Dec. 20, 2023).
[4] *Id.*

FIRST AMENDED COMPLAINT

healthier blood sugar levels, but if left unmanaged prediabetes can turn into diabetes.[5] Therefore, individuals with prediabetes seek products that can help manage their blood sugar.

5.      Individuals also look to manage and regulate their blood sugar in order to prevent or delay an array of serious adverse health conditions, such as diabetes, heart disease, obesity, Alzheimer's, vision loss, and kidney disease. Maintaining a stable blood sugar level also impacts bodily systems and a variety of important life factors on a daily basis, including one's mood, sleep, weight, and focus. Stabilizing blood sugar levels can have positive short and long-term health benefits, and diabetics as well as non-diabetics seek products that will assist in maintaining healthy blood sugar levels.

6.      This putative class action arises from Abbott Laboratories abuse of consumer trust by marketing its popular "Glucerna" brand shakes and powders as products that can "[]help manage blood sugar" and "formulated specifically for diabetics" even though they contain sucralose and other key ingredients shown to deregulate blood sugar, worsen diabetes, and even cause it, among other harms.

7.      Noting specifically the "increased risk of type 2 diabetes, cardiovascular diseases, and mortality in adults," the World Health Organization advised in May 2023 against consuming sugar alternatives like the sucralose featured in the Products.[6] Other medical studies are in accord.

8.      Public service organizations including the Center for Science in the Public Interest and the Cornucopia Institute have likewise cautioned against the consumption of sucralose and identified it as a "high risk" ingredient due to studies linking sucralose to diabetes and blood cancers.[7]

9.      Abbott Laboratories employs teams of food scientists who know about these health risks, but nowhere does Abbott Laboratories disclose any of them. Abbott Laboratories elects

---

[5] CLEVELAND CLINIC, *supra* note 2.

[6] *WHO Advises Not to Use Non-Sugar Sweeteners for Weight Control in Newly Released Guideline*, WORLD HEALTH ORG., (May 15, 2023), https://www.who.int/news/item/15-05-2023-who-advises-not-to-use-non-sugar-sweeteners-for-weight-control-in-newly-released-guideline.

[7] *Sucralose*, CTR. FOR SCI. IN THE PUB. INT., https://www.cspinet.org/article/sucralose (last updated Jan. 4, 2021); *Carrageenan: Risks and Reality*, THE CORNUCOPIA INST. (Aug. 31, 2021), https://www.cornucopia.org/2013/12/carrageenan-risks-reality/.

instead to tell an affirmatively false story, prominently on the front labels of its Glucerna Products, that the Products "help manage blood sugar" and are the "#1 doctor recommended brand" that is "specifically designed for people with diabetes" (collectively, the "**Challenged Health Claims,**" as follows:

    a.    <u>Glucerna Original Shakes, Glucerna Hunger Smart Shakes,</u> <u>Glucerna Protein Smart Shakes,</u> and <u>Glucerna Original Snack Shakes:</u> "help manage blood sugar"; "#1 doctor recommended brand"; "scientifically designed for people with diabetes" (collectively, the "Shakes").

    b.    <u>Glucerna Hunger Smart Powder</u>: "#1 doctor recommended brand"; "scientifically designed for people with diabetes" (the "Powder," together with the Shakes and collectively, the "Glucerna Products" or the "Products").

10.    Abbott Laboratories' deceptive marketing has proved profitable, and Abbott Laboratories now enjoys a leading market position in the multi-billion-dollar health foods industry. As Abbott Laboratories intended, reasonable consumers understand the Challenged Health Claims to mean the Products are healthy sugar-alternative drinks and powders that are suitable for, or can aid in, the management of blood sugar generally and for those with diabetes specifically. But because all the Products are made with sucralose, they are neither healthy nor suitable for these purposes. Instead, according to science yet unknown to consumers, sucralose negatively affects pancreatic beta cells, promotes insulin resistance, destabilizes glucose absorption, causes obesity, and harms the gut microbiome.

11.    Similarly harmful to diabetics, and blood sugar regulation for everyone, are two other ingredients featured in the Shakes: (1) carrageenan, an additive that impairs insulin signaling; and (2) maltodextrin, a carbohydrate in the Glucerna Original and Snack Shakes which negatively influences the gut microbiome and has a glycemic index superseding that of table sugar.

12.    Further underscoring the need for judicial intervention is the rising rate of diabetes and prediabetes in the United States.[8] This population especially depends on truthful label claims to make safe, informed choices to manage their disease and live a longer and healthier life. Abbott

---

[8] DIABETES RSCH. INST., *supra* note 1.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Laboratories' decision to instead prey on them for profit while knowingly ignoring the science on sucralose and other featured ingredients is unconscionable and cannot stand under consumer protection laws.

13.    Against this backdrop, the Products are not "scientifically designed for people with diabetes" as Abbott Laboratories boldly touts. Nor do they "help manage blood sugar" as promised. Instead, the Products negatively affect blood sugar levels and gut health, which can be harmful to everyone and especially those with diabetes.

14.    Absent judicial intervention, millions of diabetics and other consumers concerned about managing their blood sugar will continue to unknowingly ingest unhealthy ingredients in Products they would otherwise avoid—and pay Abbott Laboratories a premium to do so. True and accurate depictions of the Products' false labels and packaging are shown below as "**Exhibits 1-5**."

**Exhibit 1: Glucerna Original Shakes**

 

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265




FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265



FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

**Exhibit 2: Glucerna Hunger Smart Shakes**



FIRST AMENDED COMPLAINT

1

**Exhibit 3: Glucerna Protein Smart Shakes**



FIRST AMENDED COMPLAINT

**Exhibit 4: Glucerna Original Snack Shakes**



///
///
///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   ///
25   ///
26   ///
27   ///
28   ///

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265



FIRST AMENDED COMPLAINT

**Exhibit 5: Glucerna Hunger Smart Powder**



///

///

///

FIRST AMENDED COMPLAINT

1
2

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

15.    **The Products.** All Glucerna Products at issue are manufactured or sold by Abbott Laboratories to consumers in California and the United States. The Products are:

      i.    **Glucerna Original Shake**: all flavors, varieties, and sizes of Glucerna Original Shake drinks, including but not limited to, Glucerna Original Homemade Vanilla, Glucerna Original Creamy Strawberry, Glucerna Original Rich Chocolate, Glucerna Original Classic Butter Pecan, and Glucerna Original Chocolate Caramel;

      ii.    **Glucerna Hunger Smart Shake**: all flavors, varieties, and sizes of Glucerna Hunger Smart Shakes, including, but not limited to, Glucerna Hunger Smart Rich Chocolate, Glucerna Hunger Smart Homemade Vanilla, Glucerna Hunger Smart Creamy Strawberry, and Glucerna Hunger Smart Peaches & Crème;

      iii.    **Glucerna Protein Smart Shake**: all flavors, varieties and sizes of Glucerna Protein Smart Shake, including, but not limited to, Glucerna Protein Smart Chocolate and Glucerna Protein Smart Vanilla;

      iv.    **Glucerna Original Snack Shake**: all flavors, varieties and sizes of Glucerna Original Snack Shake, including, but not limited to, Glucerna Original Snack Rich Chocolate and Glucerna Original Snack Homemade Vanilla; and,

      v.    **Glucerna Hunger Smart Powder**: all flavors, varieties and sizes of Glucerna Hunger Smart Powder, including, but not limited to, Glucerna Hunger Smart Powder Rich Chocolate and Glucerna Hunger Smart Powder Homemade Vanilla.

16.    **The Deception.** Through labeling, packaging, advertising, and marketing its Glucerna Products with the Challenged Health Claims ("to help manage blood sugar," "scientifically designed for people with diabetes," "#1 doctor recommended brand"), Abbott Laboratories misleads reasonable consumers, including Plaintiffs, into believing the Products are healthy sugar-alternative drinks and powders that provide diabetes and blood sugar management benefits, when they do not.

17.     **Primary Dual Objectives.** Plaintiffs bring this action individually and on behalf of those similarly situated consumers who purchased the Products during the relevant Class Period (Class defined *infra*), for dual primary objectives: *One*, Plaintiffs seek, on their behalf and on behalf of the Class, injunctive relief to stop Abbott Laboratories' unlawful manufacture, marketing, and sale of the Products  to avoid or mitigate the risk of deceiving the public into believing the Products can provide the advertised benefits, by requiring that Abbott Laboratories change its business practices, which may include one or more of the following: remove the "to help manage blood sugar," "scientifically designed for people with diabetes," and "#1 doctor recommended brand" claims on the Products' labels and/or packaging, and/or discontinuance of the Products' manufacture, marketing, and/or sale. *Two*, Plaintiffs seek, on their behalf and on behalf of the Class, monetary recovery of the premium consumers paid for the Products due to the false and deceptive labeling, consistent with permissible law (including, for example, damages, restitution, disgorgement, and any applicable penalties solely as those causes of action so permitted).

## II.     <u>JURISDICTION AND VENUE</u>

18.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Section 1332, because: (i) the Class consists of 100 or more members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) minimal diversity exists because at least one Plaintiff (CA) and Defendant (IL) are citizens of different states. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. Section 1367.

19.     Venue is proper in this District under 28 U.S.C. Section 1391 because a substantial part of the events, omissions, and acts giving rise to Abbott Laboratories' claims occurred in this District. Abbott Laboratories markets and sells Products in this District, Abbott Laboratories gains substantial revenue and profits from doing business in this District, and consumers pay Abbott Laboratories in this District.

20.     Abbott Laboratories is subject to personal jurisdiction in California based upon sufficient minimum contacts that exist between Abbott Laboratories and California. Abbott Laboratories is authorized to do and is doing business in California, and Abbott Laboratories

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

advertises and solicits business in California. Abbott Laboratories has purposefully availed itself of the protections of California law and should reasonably expect to be hauled into court in California for harm arising out of its pervasive contacts with California.

### III.   PARTIES

21.   **Plaintiff Steven Prescott**. The following is alleged based upon Plaintiff Prescott's personal knowledge:

   a.   **Residence**. Plaintiff Prescott is, and at all times relevant was, a resident of California residing in the county of Santa Cruz.

   b.   **Purchase Details and Background Information**. Plaintiff Prescott was diagnosed with Type 2 diabetes in 2005 and continues to suffer from diabetes through the time of the filing of this Complaint. As a diabetic, Plaintiff Prescott seeks products that will aid in helping him manage his diabetes and regulate his blood sugar levels. Plaintiff purchased the Glucerna Original Shake Homemade Vanilla and Glucerna Original Shake Creamy Strawberry Products in California within the last four (4) years of the filing of this Complaint from a Rite Aid store located in Santa Cruz, California in or around September 2021. Plaintiff paid approximately $13 for each pack of six.

   c.   **Reliance on Challenged Health Claims**. In making his purchases, Plaintiff Prescott relied upon Abbott Laboratories' labeling, marketing, and advertising claims, that the Products could "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand." These label claims were prepared and approved by Abbott Laboratories and disseminated statewide and nationwide, as well as designed to encourage consumers like Plaintiff to purchase the Products. Plaintiff understood the Products' labels and advertising to mean that the Products would be suitable for him as a diabetic and would aid in managing his blood sugar levels, and he relied upon the Challenged Health Claims when deciding to purchase the Products, to his detriment.

   a.   **Causation/Damages**. As a result of Abbott Laboratories' unlawful conduct, Plaintiff has suffered injury in fact by paying a premium for the Products due to the misleading

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

labeling on the Products' packaging. Plaintiff would not have purchased the Products, or would not have paid as much for the Products, had he known they could not provide the advertised benefits.

d. **Desire to Repurchase**: Plaintiff continues to see the Products available for purchase and intends to purchase the Products again in the future if he could be sure the Products were truthful and compliant with California and federal consumer protection laws.

e. **Lack of Personal Knowledge and Expertise**: Plaintiff is not personally familiar with, and does not possess any specialized knowledge skill, experience, or education, in the manufacture of sugar alternatives and nutritional drinks or powders. Therefore, Plaintiff has no way of determining whether Abbott Laboratories' Products can actually "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand," as advertised.

f. **Inability to Rely**. Due to Abbott Laboratories' ongoing deception, Plaintiff in the future will be unable to determine with confidence based on the labeling and/or other marketing materials, and without specialized knowledge, whether the Products truly help manage blood sugar, are suitable for people with diabetes, and aid in diabetes care. Plaintiff is currently, and in the future will be, unable to rely on the Products' representations, statements, or function as they are advertised, and so he will not know if he should buy the Product again as he intends and desires to do. Absent injunctive relief, Plaintiff cannot now or in the future rely on the representations on the Products' labels.

22. **Plaintiff Marleen Villarreal**. The following is alleged based upon Plaintiff Villarreal's personal knowledge:

a. **Residence**. Plaintiff Villarreal is, and at all times relevant was, a resident of California residing in the county of San Bernardino.

b. **Purchase Details and Background Information**. Plaintiff Villarreal was diagnosed with diabetes around 18 years ago and continues to suffer from diabetes through the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

time of the filing of this Complaint. As a diabetic, Plaintiff Villarreal seeks products that will aid in helping her manage her diabetes and regulate her blood sugar levels. Plaintiff purchased the Glucerna Original Snack Shake in Homemade Vanilla and Rich Chocolate and Glucerna Protein Smart Shake in Vanilla and Rich Chocolate in California within the last four (4) years of the filing of this Complaint from a Stater Brothers store located in Colton, California on multiple occasions between 2021 and 2023. Plaintiff paid approximately $13 for each pack of six Glucerna Protein Smart Shake and $8 for each pack of four Glucerna Original Snack Shake.

c.   **Reliance on Challenged Health Claims**. In making her purchases, Plaintiff Villarreal relied upon Abbott Laboratories' labeling, marketing, and advertising claims, that the Products are the "#1 doctor recommended brand," could "[] help manage blood sugar," and are "scientifically designed for people with diabetes." These label claims were prepared and approved by Abbott Laboratories' and disseminated statewide and nationwide, as well as designed to encourage consumers like Plaintiff to purchase the Products. Plaintiff understood the Products' labels and advertising to mean that the Products would be suitable for her as a diabetic and individual seeking to regulate her blood sugar levels. Plaintiff Villarreal relied upon the Challenged Health Claims when deciding to purchase the Products, to her detriment.

d.   **Causation/Damages**. As a result of Abbott Laboratories' unlawful conduct, Plaintiff has suffered injury in fact by paying a premium for the Products due to the misleading labeling on the Products' packaging. Plaintiff would not have purchased the Products, or would not have paid as much for the Products, had he known they could not provide the advertised benefits.

e.   **Desire to Repurchase**: Plaintiff continues to see the Products available for purchase and intends to purchase the Products again in the future if she could be sure the Products were truthful and compliant with California and federal consumer protection laws.

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

f. **Lack of Personal Knowledge and Expertise**: Plaintiff is not personally familiar with, and does not possess any specialized knowledge skill, experience, or education, in the manufacture of sugar alternatives and nutritional drinks or powders. Therefore, Plaintiff has no way of determining whether Abbott Laboratories' Products can actually "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand," as advertised.

g. **Inability to Rely.** Due to Abbott Laboratories' ongoing deception, Plaintiff in the future will be unable to determine with confidence based on the labeling and/or other marketing materials, and without specialized knowledge, whether the Products truly help manage blood sugar, are suitable for people with diabetes, and aid in diabetes care. Plaintiff is currently, and in the future will be, unable to rely on the Products' representations, statements, or function as they are advertised, and so she will not know if she should buy the Product again as she intends and desires to do. Absent injunctive relief, Plaintiff cannot now or in the future rely on the representations on the Products' labels

23. **Plaintiff Omar Masry.** The following is alleged based upon Plaintiff Masry's personal knowledge:

a. **Residence**. Plaintiff Masry is, and at all times relevant was, a resident of California residing in the county of Alameda.

b. **Purchase Details and Background Information**. Plaintiff Masry is a non-diabetic who believes he may have a familial history of diabetes. Plaintiff purchased the Glucerna Original Shake in various flavors and Glucerna Protein Smart Shake in various flavors in California within the last four (4) years of the filing of this Complaint from a Target store and various convenience stores located in Oakland, California, on multiple occasions during 2021 and 2022. Plaintiff paid approximately $4 for individual Shakes and $13 for each pack of six.

c. **Reliance on Challenged Health Claims**. In making his purchases, Plaintiff Masry relied upon Abbott Laboratories' labeling, marketing, and advertising claims, that the

17

Products could "[] help manage blood sugar." This label claim was prepared and approved by Abbott Laboratories and disseminated statewide and nationwide, as well as designed to encourage consumers like Plaintiff to purchase the Products. Plaintiff understood the Products' labels and advertising to mean that the Products would be suitable for him as an individual seeking to maintain healthy blood sugar levels and prevent type-2 diabetes, and he relied upon the Challenged Health Claims when deciding to purchase the Products, to his detriment.

d. **Causation/Damages.** As a result of Abbott Laboratories' unlawful conduct, Plaintiff has suffered injury in fact by paying a premium for the Products due to the misleading labeling on the Products' packaging. Plaintiff would not have purchased the Products, or would not have paid as much for the Products, had he known they could not provide the advertised benefits.

e. **Desire to Repurchase**: Plaintiff continues to see the Products available for purchase and intends to purchase the Products again in the future if he could be sure the Products were truthful and compliant with California and federal consumer protection laws.

f. **Lack of Personal Knowledge and Expertise**: Plaintiff is not personally familiar with, and does not possess any specialized knowledge skill, experience, or education, in the manufacture of sugar alternatives and nutritional drinks or powders. Therefore, Plaintiff has no way of determining whether Abbott Laboratories' Products can actually "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand," as advertised.

g. **Inability to Rely.** Due to Abbott Laboratories' ongoing deception, Plaintiff in the future will be unable to determine with confidence based on the labeling and/or other marketing materials, and without specialized knowledge, whether the Products truly help manage blood sugar, are suitable for people with diabetes, and aid in diabetes care. Plaintiff is currently, and in the future will be, unable to rely on the Products' representations, statements, or function as they are advertised, and so he will not know

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

if he should buy the Product again as he intends and desires to do. Absent injunctive relief, Plaintiff cannot now or in the future rely on the representations on the Products' labels.

24.    **Plaintiffs' Future Harm**. Abbott Laboratories' unlawful conduct caused and continues to cause substantial injury to Plaintiffs and Class members.   Abbott Laboratories continues to market and sell the Products as nutritional drinks and powders that "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand." Plaintiffs intend to purchase the Products in the future if they can be sure the Products can provide the advertised benefits. However, Plaintiffs are average consumers who are not sophisticated in, for example, the ingredients that go into making diabetic nutritional drinks and powders, similar to and including the Products, and they cannot determine if the Products can achieve their advertised benefits in the future, absent injunctive relief. Since Plaintiffs would like to purchase the Products again—despite the fact that the Products currently cannot achieve the advertised benefits—Plaintiffs would likely and reasonably, but incorrectly, assume the Products can achieve the advertised benefits. Accordingly, Plaintiffs are at risk of reasonably, but incorrectly, assuming that Abbott Laboratories has fixed the Products such that Plaintiffs may buy them again, believing they can achieve the advertised benefits of diabetes and blood sugar management. In this regard, Plaintiffs are currently and, in the future, deprived of the ability to rely on the Products' labeling and packaging. However, an injunction prohibiting use of the Challenged Health Claims unless true would enable Plaintiffs to rely confidently on the Product labels in making their future purchase decisions.

25.    **Defendant Abbott Laboratories** is a company headquartered in Abbott Park, Illinois. Abbott Laboratories is located at 100 Abbott Park Road, Abbott Park, Illinois 60064. Abbott Laboratories, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Abbott Laboratories is the owner, manufacturer, and/or distributor of the Products, and is a company that created and/or authorized the false, misleading, and deceptive labeling and packaging for the Products. Abbott Laboratories and its agents manufactured, advertised, marketed, and sold the Products in this jurisdiction and in

1  this judicial district. The unfair, unlawful, deceptive, and misleading false advertising claims on the

2  Products were prepared, authorized, ratified, and/or approved by Abbott Laboratories and its agents,

3  and, accordingly, disseminated throughout the State of California and nationwide by Abbott

4  Laboratories and its agents to deceive and mislead consumers into purchasing the Products.

5  **IV.**   **FACTUAL ALLEGATIONS**

6      **A.**   **Background on Products and Product Claims**

7      26.   **Sucralose**. Sucralose was discovered in 1976 by chemists who were testing it for use

8  as an insecticide. Because of its sweet taste, its potential as a food additive was explored. Sucralose

9  is synthesized by chlorinating the sugar sucrose, by substituting three hydroxyl groups with three

10  chlorine atoms. Sucralose is approximately 600 times sweeter than sucrose, or sugar. Since 1998,

11  Abbott Laboratories' Glucerna brand has been associated with shakes and powders purportedly

12  "formulated specifically for diabetics and others with dietary restrictions,"[9] including the Products

13  featuring sucralose.

14      27.   Since their introduction to the marketplace, non-nutritive sweeteners (NNS, also

15  known as artificial sweeteners and/or low-calorie sweeteners) like that used in the Products, have

16  drastically risen in popularity among the general population, due to increased incidence of obesity,

17  diabetes, metabolic syndrome, as well as general consumer awareness and desire for alternatives

18  that offer fewer calories and more intense sweetness than sugar.[10]   Consumers who use products

19  containing NNS ingest them chronically, often for several years or decades. Sucralose is consumed

20  by people with and without diabetes because they mistakenly believe sucralose to be a healthier

21  alternative to sugar that will help regulate and maintain healthy blood sugar levels and aid in the

22  management of metabolic conditions such as diabetes.

23      28.   **Diabetes, Generally**. Roughly 38.4 million Americans, or more than 1 in 10

24  Americans, have diabetes.[11]   Diabetes is characterized by high blood sugar caused by the inability

[9] *See* Defendant's official website at http://www.abbott.com/about-abbott/our-heritage.html (last visited Dec. 21, 2023).
[10] Arun Sharma et al., *Artificial sweeteners as a sugar substitute: Are they really safe?*, 48 INDIAN J. PHARMA. 3, 237-40, (2016).
[11] *National Diabetes Statistics Report,* CDC, https://www.cdc.gov/diabetes/data/statistics-report/index.html (last visited Dec. 21, 2023).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

to produce enough insulin—a hormone that allows sugar to be removed from the blood stream and used for energy in the cells of the pancreas. The most common form of diabetes is Type 2 diabetes, which impairs the pancreas due to insulin resistance typically as a result of diet and lifestyle factors.[12]  Insulin resistance means that the cells in the pancreas stop responding to insulin that normally triggers the flow of glucose into the cells.[13]  When the cells become resistant, insulin is no longer able to signal glucose uptake, so it remains in the blood stream where it causes problems like organ failure and diabetes.[14]  People who suffer from Type 2 diabetes may be prescribed medicine but generally manage the disease via exercise and healthy eating.  That is why people with Type 2 diabetes seek out food products that are nutritional and can help them manage their blood sugar.

29.   **The Products Contain Express and Implied Health Claims.** The Product labels contain express claims that they are suitable for diabetics and/or aid in managing blood sugar levels. *See* Challenged Health Claims, *supra*. The Challenged Health Claims not only serve as express claims regarding diabetes, but they also serve as implied health claims to all consumers, including non-diabetics, who reasonably understand the claims to mean the Products are healthy sugar-alternative shakes and powders for people with diabetes as well as those without seeking to regulate and maintain healthy blood sugar levels.

   a.   The Glucerna Original Shakes, Glucerna Hunger Smart Shakes, Glucerna Protein Smart Shakes and Glucerna Original Snack Shakes contain the following claims directly on the front of the packaging:

      i.   "To Help Manage Blood Sugar"

      ii.   "Scientifically Designed For People With Diabetes"

      iii.   "#1 Doctor Recommended Brand"

   b.   The Glucerna Hunger Smart Powders contain the following statements on the front of the packaging: "Scientifically Designed For People With Diabetes" and "#1 Doctor Recommended Brand."

---

[12] CDC, *supra* note 3.
[13] *Id.*
[14] *Id.*

21

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

30.     **The Products Contain Sucralose, which is Harmful to Diabetics and is Generally Unhealthy.** A core ingredient in all the Products is sucralose. While the Products purport to aid with blood sugar management and be designed specifically for people with diabetes, sucralose has been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes itself by interfering with bodily responses responsible for controlling glucose and energy homeostasis.[15] The ingestion of sucralose causes blood sugar destabilization by triggering an abnormally high reaction to glucose, causing it to irrationally spike after consuming a normal meal.[16]  Compared to a control group consuming water, sucralose ingestion caused a greater blood sugar spike, larger insulin spike and secretion rate, and a decrease in insulin clearance in adults who were otherwise insulin sensitive.[17] For example, a 2014 study found that sucralose added to both normal and high-fat diets altered animal metabolisms and raised blood glucose to significantly higher levels than sugar-consuming counterparts.[18] The authors concluded that regular consumption of NAS including sucralose increased glucose intolerance, a marker of diabetes.

31.     In a recent large-scale study of 105,588 participants conducted in July 2023 researchers studied the relationship between sucralose (and other artificial sweeteners) and the risk of Type 2 diabetes. The study discovered that as compared to non-consumers of sucralose, those who consume sucralose had a higher risk of developing adverse conditions related to glucose metabolism, including metabolic syndrome, also known as insulin resistance syndrome, a pre-condition to Type 2 diabetes.[19] A 2017 study found that after only two weeks of daily sucralose intake, there was a glucose absorption enhancement, worsening blood glucose response to external

---

[15] M. Yanina Pepino, *Metabolic Effects of Non-Nutritive Sweeteners*, 152 (PART B) PHYSIOLOGY & BEHAV., 450, 450 (Dec. 1, 2015),
https://www.sciencedirect.com/science/article/pii/S0031938415003728#bb0215.

[16] M. Yanina Pepino et al., *Sucralose Affects Glycemic and Hormonal Responses to an Oral Glucose Load*, 36 DIABETES CARE 2530, 2530-34 (Apr. 30, 2013),
https://pubmed.ncbi.nlm.nih.gov/23633524/.

[17] *Id.*

[18] Taylor Feehley and Cathryn R. Nagler, *The weighty costs of non-caloric sweeteners*, 514 NATURE 176-177 (oct. 9, 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4449731/.

[19] Charlotte Debras et al., *Artificial Sweeteners and Risk of Type 2 Diabetes in the Prospective NutriNet-Sante Cohort*, DIABETES CARE (July 25, 2023),
https://diabetesjournals.org/care/article/doi/10.2337/dc23-0206/153434/Artificial-Sweeteners-and-Risk-of-Type-2-Diabetes.

glucose, and a deleterious impact on glycemic control, which causes a predisposition for diabetes in healthy adults.[20]

32.     Further undermining Abbott Laboratories' Challenged Health Claims is a May 2023 comprehensive review of 11 meta-analyses derived from 7 systemic reviews finding that consumption of artificially sweetened beverages, including sucralose, is associated with a higher risk of obesity, Type 2 diabetes, hypertension, cardiovascular disease incidence, and all-cause mortality.[21]

33.     **Sucralose Damages Pancreatic Beta-Cells.** While the Products claim "to help manage blood sugar," the truth is the sucralose in the Products *deregulates* blood sugar by disrupting the gut microbiome, causing gut dysbiosis, and damaging residual functioning of the pancreas through multiple pathways. It induces a prediabetic state by killing beta cells of the pancreas that release insulin, which after prolonged consumption leads to diabetes.[22]  When these beta cells die, insulin is no longer produced, and diabetes becomes more severe and permanent.[23]  Sucralose can also cause necrosis of the pancreas and inflammation of the liver because of its negative effect on gut health.[24]

34.     **Sucralose Causes Insulin Resistance.** Sucralose decreases insulin sensitivity, meaning it causes cells to be more resistant to insulin, which signals the cells to take sugar out of

---

[20] Richard Young et al., *Impact of Artificial Sweeteners on Glycaemic Control in Healthy Humans,* EUROPEAN ASS'N FOR THE STUDY OF DIABETES, (Sept. 14, 2017), https://www.easd.org/media-centre/home.html#!resources/impact-of-artificial-sweeteners-on-glycaemic-control-in-healthy-humans.

[21] Cristina Diaz et al., *Artificially Sweetened Beverages and Health Outcomes: An Umbrella Review,* 14(4) ADVANCES IN NUTRITION 710, 710 (July, 2023), https://www.sciencedirect.com/science/article/pii/S2161831323003150?via%3Dihub.

[22] S. Gupta et al., *Sucralose Induced Pancreatic Toxicity in Albino Rats: Histomorphological Evidence*, 31 J. MORPHOL. SCI 123, 125-6 (2014), https://d-nb.info/1181607574/34.

[23] Patrik Rorsman & Frances M Ashcroft, *Pancreatic β-Cell Electrical Activity and Insulin Secretion: Of Mice and Men,* 98 (1) PHYSIOLOGICAL REVIEWS 117, 117-18 (Jan. 1, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5866358/.

[24] Xiaoming Bian et al., *Gut Microbiome Response to Sucralose and Its Potential Role in Inducing Liver Inflammation in Mice*, 8 FRONT PHYSIOL 487, 487-88 (July 24, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5522834/.

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

the bloodstream.[25] For example, in a 2020 study, participants were given either sucralose or water followed by a glucose tolerance test. The study found that those who consumed sucralose had higher blood insulin levels.[26]  This can cause a suffering pancreas, as seen in Type 2 diabetics, to work even harder, pumping more and more insulin resulting in the cells becoming more resistant. Over time, the pancreas can shut down and the cells no longer respond to insulin (i.e., insulin resistance) which can cause high blood sugar and diabetes.[27]

35.    Because sucralose acts like glucose, it gets mistaken as such by the sweet taste receptors in the pancreas. This weakens insulin receptors, causing the release of insulin that leads to Type 2 diabetes and obesity.[28] Sucralose also causes insulin resistance by triggering faster insulin secretion rate while decreasing insulin clearance (i.e., removal from the blood).[29] This heightened level of insulin in the blood further weakens insulin receptors which prevents cells from taking in glucose, causing permanent high blood sugar and a weakened pancreas—a feature of diabetes.[30]

36.    Insulin resistance caused by sucralose also impacts healthy individuals. A short-term study (14 days) that tested sucralose consumption at 15% the Acceptable Daily Intake (ADI) in healthy participants found a significant decrease in insulin sensitivity.[31] Another short-term study (10 days) discovered that when sucralose is paired with a carbohydrate such as maltodextrin, as it is in Abbott Laboratories' Products, its consumption decreases insulin sensitivity in non-diabetic

---

[25] Yanina M. Pepino, *The Not-So Sweet Effects of Sucralose on Blood Sugar Control*, 108(3) THE AM. J. OF CLINICAL NUTRITION 431, 431-432 (Sept., 2018), https://www.sciencedirect.com/science/article/pii/S0002916522029665?via%3Dihub.

[26] Kushagra Mathur et al., *Effect of Artificial Sweeteners on Insulin Resistance Among Type-2 Diabetes Mellitus Patients*, 9 (1) J. FAM. MED PRIM. CARE 69, 69 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7014832/.

[27] *Type 2 Diabetes,* CDC, https://www.cdc.gov/diabetes/basics/type2.html (last visited Dec. 21, 2023).

[28] Mathur, *supra* note 28.

[29] *Id.*

[30] *Id.*

[31] Alonso Romo-Romo et al., *Sucralose Decrease Insulin Sensitivity in Healthy Subjects: A Randomized Controlled Trial*, 108 AM. J. CLINOURT ICAL NUTRITION 485, 485 (Sept. 1, 2018), https://pubmed.ncbi.nlm.nih.gov/30535090/; Pepino, *supra* note 27.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED COMPLAINT

participants.[32] Likewise, following a 4-week consumption of sucralose in healthy participants in a randomized, double-blind, placebo-controlled study, sucralose was found to decrease insulin sensitivity.[33] In a longer-term study of 10-weeks, sucralose consumption was found to lead to gut dysbiosis and altered insulin and glucose levels in healthy young adults.[34] Notably, in a randomized, placebo-controlled clinical trial, even a single 48 mg sip of sucralose increased the amount of insulin in the blood to an unhealthy level (known as hyperinsulinemia) in otherwise healthy participants.[35] Human consumption of low amounts of sucralose, well below the suggested daily intake, can lead to negative changes in glucose metabolism and insulin response even in healthy, non-diabetic individuals.[36]

37.    **Sucralose Harms the Gut Microbiome.** Sucralose has also been shown to cause gut dysbiosis (i.e., an imbalance between good and bad bacteria in the gut) and inflammation.[37] A disruption in the bacterial environment in the gut from sucralose causes inflammation, worsens insulin resistance, and promotes obesity and increases sugar cravings.[38]  Even minimal amounts of

---

[32] Jelle R. Dalenberg et al., *Short-Term Consumption of Sucralose With, but Not Without, Carbohydrate Impairs Neural and Metabolic Sensitivity to Sugar in Humans*, 31(3) CELL METABOLISM 493, 493 (Mar. 3, 2020), https://www.cell.com/cell-metabolism/fulltext/S1550-41312030057-7.

[33] Amornpan Lertrit et al., *Effects of Sucralose on Insulin and Glucagon-Like Peptide-1 Secretion in Healthy Subjects: A Randomized, Double-Blind, Placebo-Controlled*, 55-56 NUTRITION 125, 125 (Nov., 2018), https://www.sciencedirect.com/science/article/abs/pii/S0899900718302557?via%3Dihub.

[34] Lucia A. Mendez-Garcia et al., *Ten-Week Sucralose Consumption Induces Gut Dysbiosis and Altered Glucose and Insulin Levels in Healthy Young Adults*, 10 MICROORGANISMS 434, 434 (Feb. 14, 2022), https://www.mdpi.com/2076-2607/10/2/434/html.

[35] Angelica Y. Gomez-Arauz et al., *A Single 48mg Sucralose Sip Unbalances Monocyte Subpopulations and Stimulates Insulin Secretion in Healthy Young Adults*, J. IMMUNOL RSCH. (Apr. 28, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6512026/.

[36] Romo-Romo et al., *supra* note 33.

[37] Susan S. Schiffman & Kristina I. Rother, *Sucralose, A Synthetic Organochlorine Sweetener: Overview of Biological Issues*, 16 J. OF TOXICOLOGY AND ENV'T HEALTH, PART B 399, 399 (Nov. 12, 2013), https://www.tandfonline.com/doi/pdf/10.1080/10937404.2013.842523?noFrame=true.

[38] Clare J. Lee et al., *Gut Microbiome and its Role in Obesity and Insulin Resistance,* 1461(1) ANN N.Y. ACAD. SCI. 37, 37 (May 14, 2019), https://pubmed.ncbi.nlm.nih.gov/31087391/.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

sucralose intake can increase acidity of the entire GI tract and kill good bacteria for weeks after consumption.[39]

38.     A 2018 study conducted over 6-weeks found that sucralose worsened gut inflammation in mice with Crohn's disease, a type of inflammatory bowel disease that causes swelling of the tissues in the digestive tract that affects over half a million people in the United States.[40] Because mice and rats are biologically similar to humans, they provide "excellent" animal models for studying human physiology.[41] Mice and rats share 95 percent of their genes with humans, have similar immune systems, and obtain similar diseases for many of the same genetic reasons.[42] Because of this, mice and rats serve as primary model systems for studying human pathophysiology in clinical settings.[43]

39.     Recent studies on the effect of sucralose on gut microbiome in humans have resulted in similar significant findings and conclusions indicating a negative effect of sucralose on human gut health. Randomized clinical studies involving fecal samples of healthy adult volunteers found that sucralose directly alters the gut microbiome by increasing intestinal bacteria and is associated with the promotion of inflammatory responses in the gut and liver.[44] In a study published in 2022, healthy participants who consumed 48 mg of sucralose every day for ten weeks were found to have gut dysbiosis.[45] Daily ingestion of 48 mg of sucralose amounts to less than 15% of the ADI.[46] While

---

[39] Mohamed B. Abou-Donia et al., *Splenda Alters Gut Microflora and Increases Intestinal p-Glycoprotein and Cytochrome p-450 in Male Rats*, 71 J TOXICOL. ENV'T. HEALTH 1415 (2008) https://pubmed.ncbi.nlm.nih.gov/18800291/.

[40] Alexander Rodriguez-Palacios et al., *The Artificial Sweetener Splenda Promotes Gut Proteobacteria, Dysbiosis, and Myeloperoxidase Reactivity in Crohn's Disease—Like Ileitis*, 24 INFLAMMATORY BOWEL DISEASE 1005, 1005 (Mar. 15, 2018), https://academic.oup.com/ibdjournal/article/24/5/1005/4939054; *Definition & Facts for Crohn's Disease*, NIDDK, https://www.niddk.nih.gov/health-information/digestive-diseases/crohns-disease/definition-facts (last visited Dec. 1, 2023).

[41] Elizabeth C. Bryda, *The Mighty Mouse: the impact of rodents on advances in biomedical research*, 110 Missouri Med. 207-11 (2013).

[42] *Id.*

[43] *Id.*

[44] Mendez-Garcia et al., *supra*, note 36; Konstantinos Gerasimidis et al., *The impact of food additives, artificial sweeteners and domestic hygiene products on the human gut microbiome and its fibre fermentation capacity*, 59 EUR. J. NUTR. 3213-3230 (Dec. 18, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7501109/.

[45] Mendez-Garcia et al., *supra*, note 36.

[46] Mendez-Garcia et al., *supra*, note 34.

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

the science continues to emerge, persuasive evidence shows that long-term sucralose ingestion induces gut dysbiosis associated with altered insulin and glucose levels even at typical or less-than-typical consumption amounts.[47] The alteration of gut microbiota caused by sucralose can lead to systemic inflammation and metabolic dysregulation and disrupt the immune system, which contributes to the development of disease.

40.    Interference with gut microbiota from sucralose also induces glucose intolerance and interacts with sweet-taste receptors in the digestive system that play a vital role in glucose absorption and insulin secretion, meaning sucralose deregulates blood sugar management.[48] Additionally, the sucralose induced gut dysbiosis triggers beta cell destruction of the pancreas, an organ necessary for our bodies to produce insulin which naturally regulates blood sugar.[49]

41.    **Sucralose Promotes Obesity.** Sucralose also increases sugar cravings, which can lead to overconsumption of sugars and cause weight gain and obesity.[50] Obese individuals who consume sucralose are found to have much higher blood sugar and insulin spikes in response to normal sugar, which not only promotes weight gain, but also promotes insulin resistance as it impairs insulin signaling that causes less glucose uptake from the blood.[51] Thus, consumption of sucralose increases the risk of Type 2 diabetes and obesity, thereby decreasing the overall health and human life expectancy.[52]

---

[47] Mendez-Garcia et al., *supra*, note 34; Francisco Javier Ruiz-Ojeda et al., *Effects of Sweeteners on the Gut Microbiota: A Review o Experimental Studies and Clinical Trials*, 10 ADV. NUTR. (Feb. 5, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6363527/.
[48] *Id.*
[49] Gupta, *supra,* note 22.
[50] Qing Yang, *Gain Weight by "Going Diet?" Artificial Sweeteners and the Neurobiology of Sugar Cravings*, 83 YALE J. BIOL. MED. 101, 101 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892765; Qiao-Ping Wang et al., *Sucralose Promotes Food Intake Through NPY and a Neuronal Fasting Response*, 24 CELL METABOLISM 75, 75 (2016), https://www.cell.com/cell-metabolism/comments/S1550-4131(16)30296-0#secsectitle0010.
[51] Hubert Kolb et al., *Insulin: Too Much of a Good Thing is Bad*, BMC MED (2020), https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-020-01688-6#:~:text=Because%20of%20the%20largely%20unrestricted,increased%20risk%20of%20cardiovascular%20disease.
[52] *Id.*

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

42.    A study conducted in February 2023 found that newborns whose mothers heavily consumed sucralose during their pregnancy had a higher birth weight than those whose mothers consumed sucralose and other non-nutritive sweeteners only sporadically.[53] The newborns were significantly heavier and above the 95th percentile of birth weight.

43.    **Surcalose-6-Acetate, a Sucralose Metabolite, has Been Linked to Genotoxicity.** Sucralose-6-acetate is an impurity left over from the manufacturing process of sucralose. Regardless of whether a product contains Sucralose-6-acetate in its original formulation, it is a metabolite of sucralose, meaning it is formed in the gut once sucralose is digested. A recent study published on May 29, 2023, found evidence that sucralose-6-acetate is genotoxic (i.e., destroys human DNA).[54] The study reaffirms the harm sucralose causes by promoting diabetes and destabilizing blood sugar. Further, sucralose-6-acetate, when exposed to human intestinal cells, increased inflammation, oxidative stress, and caused cancer. The study further showed that sucralose disrupts essential cellular processes that metabolize toxins, increasing risk of adverse toxicological exposures and cellular toxicity. Both sucralose and sucralose-6-acetate impair the intestinal barrier to cause a "leaky gut," which is problematic because toxins that normally would be flushed out of the body in feces are instead leaked out of the gut and absorbed into the bloodstream where they cause disease.

44.    **Other Ingredients in the Glucerna Original Shakes, Glucerna Protein Smart Shakes, Glucerna Hunger Smart Shakes, and the Glucerna Original Snack Shakes, Also Promote the Development of Diabetes by Causing Glucose Intolerance and Insulin Resistance.** In addition to sucralose, the Products contain additives, including carrageenan and maltodextrin, that contribute to glucose intolerance and insulin resistance. Exposure to low concentration (i.e.,

---

[53] Jose Alfredo Aguayo-Guerrero et al., *Newborns from Mothers Who Intensely Consumed Sucralose during Pregnancy Are Heavier and Exhibit Markers of Metabolic Alteration and Low-Grade Systemic Inflammation: A Cross-Sectional, Prospective Study*, 11 BIOMEDICINES 650, 650 (Feb. 21, 2023), https://www.semanticscholar.org/paper/Newborns-from-Mothers-Who-Intensely-Consumed-during-Aguayo-Guerrero-M%C3%A9ndez-Garc%C3%ADa/7e741d2539290a3f4583bc1f323c07bffcf8d989.

[54] Susan S. Schiffman et al., *Toxicological and Pharmacokinetic Properties of Suraclose-6-Acetate and its Parent Sucralose: In Vitro Screening Assays*, 26(6) J. OF TOXICOLOGICAL AND ENV'T HEALTH, PART B 307, 307 (May 29, 2023), https://www.tandfonline.com/doi/full/10.1080/10937404.2023.2213903.

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

10 mg/L) of carrageenan for only six days led to carrageenan-induced inflammation, which impairs insulin signaling, meaning the cells do not take up glucose and the resulting high blood glucose levels cause organ damage over time.[55] As a result, another study concluded that the "*elimination of dietary ingestion of carrageenan [like that in Abbott Laboratories' Shakes] may help in efforts to reduce the incidence of diabetes and its associated morbidities.*[56] (emphasis added). Carrageenan has been found to impair glucose tolerance, increase insulin resistance, and inhibit insulin signaling in both mice and human hepatocytes.[57] Despite the science, Abbott Laboratories encourages diabetics and others to consume the Shakes, and thus carrageenan, by virtue of the Challenged Health Claims.

45.     Additionally, Maltodextrin—a carbohydrate—has a significant Glycemic Index (GI) that supersedes the GI of table sugar.[58] It has also been identified as a factor that can influence the gut microbiome.[59] Maltodextrin interacts with sucralose to impair insulin sensitivity.[60] A study on forty-five healthy young adults, aged 20-45, who did not regularly consume a low-calorie sweetener found that insulin sensitivity was reduced when consuming both sucralose and maltodextrin in a beverage.[61] When paired with sucralose, maltodextrin exacerbates and promotes metabolic dysfunction associated with sucralose consumption.

---

[55] Sumit Bhattacharyya et al., *Exposure to Common Food Additive Carrageenan Alone Leads to Fasting Hyperglycemia and in Combination with High Fat Diet Exacerbates Glucose Intolerance and Hyperlipidemia Without Effect on Weight*, J. Diabetes Rsch. 1, 1 (Mar. 25, 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4390184/pdf/JDR2015-513429.pdf.
[56] *Id.*
[57] S. Bhattacharyya et al., *Exposure to the common food additive carrageenan leads to glucose intolerance, insulin resistance and inhibition of insulin signalling in HepG2 cells and C57BL/6J mice*, 55 Diabetologia, 194-203 (2012), https://link.springer.com/article/10.1007/s00125-011-2333-z.
[58] Christine Mikstas, *What is maltodextrin?*, Nourish by WebMD (July 10, 2023), https://www.webmd.com/diet/what-is-maltodextrin#:~:text=The%20glycemic%20index%20(GI)%20in,or%20diabetes%20can%20be%20fatal.
[59] *Id.*
[60]  Claire Greenhill, *Metabolic effects of sucralose*, 16 Nat. Revs. Endocrinology 256-257 (2020), https://www.nature.com/articles/s41574-020-0348-6.
[61] Jelle R. Dalenberg et al., *Short-Term Consumption of Sucralose with, but Not without, Carbohydrate Impairs Neural and Metabolic Sensitivity to Sugar in Humans*, 31(3) Cell Metab. 493, 493-502 (Mar. 3, 2020),

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

46.     **The World Health Organization ("WHO") Advises Against the Consumption of Sucralose**. On May 15, 2023, the WHO released a set of guidelines urging against the consumption of sucralose, among other non-sugar sweeteners, "to control body weight or reduce the risk of noncommunicable diseases (NCDs)," including diabetes.[62] The WHO's advisory comes on the heels of "the findings of a systematic review of the available evidence …suggest[ing] that there may be potential undesirable effects from long-term use of NSS [non-sugar sweeteners], such as an *increased risk of type 2 diabetes*, cardiovascular diseases, and mortality in adults."[63] (emphasis added). Still, Abbott Laboratories continues to tout the Products as specifically "designed" for those with diabetes and as "recommended" by doctors.

47.     **The Center for Science in the Public Interest ("CSPI") Advises Against Consumption of Sucralose.** Founded in 1971, the CSPI is one of the oldest, independent, science-based, and consumer advocacy non-profit organizations in the United States.[64] The CSPI advocates for accountability and reform in the areas of nutrition, food safety, supplements, and biotechnology, and has advanced food safety reform such as the passage of the Nutrition Labeling and Education Act which mandated Nutrition Facts labels on packaged foods.[65] The CSPI has provided research-backed ratings of over 150 food additives and ingredients.[66] In its review of sucralose, the CSPI stated that sucralose, like that found in the Products, should be "avoided" by consumers considering several studies linking sucralose to significant health consequences including effects on blood sugar, gastrointestinal disorders, and causing leukemia and related blood cancers.[67]

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7784207/#:~:text=These%20findings%20indicate%20that%20consumption%20of%20sucralose%20in,suggesting%20dysregulation%20of%20gut-brain%20control%20of%20glucose%20metabolism.

[62] WORLD HEALTH ORG., *supra*, note 6.

[63] *Id.*

[64] *About CSPI*, CTR. FOR SCI. IN THE PUB. INT., https://www.cspinet.org/about (last visited Nov. 30, 2023).

[65] *Our Issues*, CTR. FOR SCI. IN THE PUB. INT., https://www.cspinet.org/advocacy/our-issues (last visited Nov. 30, 2023); *50 Years as your food and health watchdog*, CTR. FOR SCI. IN THE PUB. INT., https://www.cspinet.org/article/50-years-your-food-and-health-watchdog (last updated Oct. 13, 2021).

[66] CTR. FOR SCI. IN THE PUB. INT., *supra*, note 7.

[67] *Id.*

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

48.   **The Cornucopia Institute Identifies Sucralose A High Risk Ingredient**. The Cornucopia Institute is an independent organization serving as a watchdog within the food industry by researching issues and promoting science-based findings regarding food labeling, production, processing, and marketing.[68] In 2021, the Cornucopia Institute recognized sucralose as "a high risk ingredient with links to diabetes and leukemia."[69]  The Institute acknowledged that "sucralose is now enough of a risk that it was downgraded . . . from its 'safe' category to 'caution.'"[70]

49.   **FDA's Approval of Sucralose as a Sweetener is Based on Outdated Research and Inapplicable to the Product Claims.** Over two decades ago, in 1999, the FDA approved the use of sucralose as a sweetener for food *generally*.[71] While the FDA authorized sucralose as safe for the "general population,"[72] the FDA did not specifically authorize sucralose as healthier sugar alternative and particularly suitable and/or beneficial for people seeking to regulate their glucose levels and/or people with diabetes.

50.   **Even the First Round of Testing for FDA Approval Found Sucralose to Affect Blood Sugar.** Although the FDA approved sucralose as a general-purpose sweetener, it was based on limited clinical studies of sucralose *prior* to 1999. Still, a six-month clinical test on sucralose conducted during the first round of FDA-approval found sucralose to have a *negative* effect on blood sugar.[73] Further, reports revealed that in 1995, a marketer of sucralose products had planned to submit a product approval application but asked the FDA to withhold making a final decision after a six-month clinical study in diabetic patients raised concerns about the effect of sucralose on blood sugar.[74] This stands in contrast to Abbott Laboratories' false claim that the Products "help manage

---

[68] *About Us*, THE CORNUCOPIA INST., https://www.cornucopia.org/about-us/ (last visited Nov. 30, 2023).
[69] THE CORNUCOPIA INST., *supra*, note 7.
[70] *Id.*
[71] *Food Additives Permitted For Direct Addition to Food for Human Consumption; Sucralose*, 21 C.F.R. Part 172 (Aug. 12, 1999), https://www.govinfo.gov/content/pkg/FR-1999-08-12/pdf/99-20888.pdf.
[72] *Sweeteners Authorized as Food Additives in the U.S.*, FDA, https://www.fda.gov/food/food-additives-petitions/aspartame-and-other-sweeteners-food (last visited Nov. 28, 2023).
[73] *Food Additives Permitted for Direct Addition to Food for Human Consumption: Sucralose*, 21 C.F.R. PART 172 (Apr. 3, 1998), https://www.govinfo.gov/content/pkg/FR-1998-04-03/html/98-8750.html.
[74] Stacy Malkan, *Sucralose: Emerging science reveals health risks*, U.S. RIGHT TO KNOW (Jul. 25, 2023), https://usrtk.org/sweeteners/sucralose-emerging-science-reveals-health-risks/.

FIRST AMENDED COMPLAINT

blood sugar." In the 25 years since sucralose was initially approved as a general-purpose sweetener, newer and evolved studies have shown that, contrary to the reports the FDA relied upon in 1999, regular use and consumption of sucralose poses short and long-term health risks, including effects specifically related to glucose metabolism and insulin resistance. Yet, Abbott Laboratories continues to falsely market its Products as nutritional drinks and powders that can "help manage blood sugar", and as "scientifically designed for people with diabetes" and/or people who want to safely help manage blood sugar generally.

51.     **Abbott Laboratories Makes Improper Representations Beyond FDA's Stance on Sucralose.** While the FDA authorized sucralose as safe for the "general population" based on outdated studies, Abbott Laboratories makes affirmative representations *beyond* that by labeling and advertising the Products as particularly "designed" and "recommended" for individuals with diabetes, that they "help manage blood sugar," and are a healthier alternative to products made with sugar, despite evidence that sucralose has adverse effects on blood sugar levels, poses health risks to susceptible populations, and does not deliver the advertised benefits.

52.     Plaintiffs do not seek to impose additional or conflicting labeling, testing, or warning requirements as it relates to the Challenged Health Claims; rather, Plaintiffs seek to cure Abbott Laboratories' false and deceptive advertising, labeling, and marketing claims that the Products "help manage blood sugar" and "scientifically designed for people with diabetes," which are not mandated by the FDA. See 21 U.S.C. § 105 (no provisions governing the inclusion of a blood sugar-related or diabetic-related label claim as a special dietary use); 21 C.F.R. 101.14 (regulating express or implied health claims). Congress or the FDA have not promulgated regulations requiring health claims such as "help manage blood sugar" or "scientifically designed for people with diabetes" on food products containing sucralose, let alone one that would conflict with enjoining Abbott Laboratories' misleading use of this claim. As such, Plaintiffs are not seeking to impose labeling requirements that differ from any established by Congress or the FDA.

53.     **Petition to the Federal Trade Commission ("FTC") to Investigate the Safety of Sucralose**. Consistent with the science demonstrating the falsity of the Challenged Health Claims, the FTC has also been petitioned to investigate deceptive advertising claims by suppliers of

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

sucralose based on the evidence demonstrating sucralose metabolizes and bioaccumulates in rats.[75] The petition also highlighted deceptive misrepresentation as to the metabolic effect of sucralose in humans, presenting a 2018 study concluding that sucralose "promotes metabolic dysregulation, including fat cell genesis, dysregulation of response to insulin and glucose, inflammation," and other concerning adverse effects.[76] The recent development in science and clinical studies indicates that "now may be the time to revisit the safety and regulatory status of this organochlorine sweetener."[77]

54.   **The Products' Substantial Similarity:** Plaintiffs purchased the Glucerna Original Shakes in the Homemade Vanilla and Creamy Strawberry Product flavors, the Glucerna Original Snack Shake in various flavors, and the Glucerna Protein Smart Shakes in various flavors ("**Purchased Products**").

55.   The Glucerna Original Shakes, including without limitation, Classic Butter Pecan, Chocolate Caramel, and Rich Chocolate Product flavors ("Original Shakes"); Glucerna Hunger Smart Shakes, including without limitation, Rich Chocolate, Homemade Vanilla, Creamy Strawberry, and Peaches & Crème flavors ("Hunger Smart Shakes"); Glucerna Protein Smart Shakes, including without limitation, Chocolate and Vanilla flavors ("Protein Smart Shakes"); and Glucerna Original Snack Shake, including without limitation, Rich Chocolate and Homemade Vanilla flavors ("Snack Shakes") are substantially similar to the Purchased Products:

      i.   **Defendant Abbott Laboratories.** The Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes are manufactured, sold, marketed, advertised, labeled, and packaged by Defendant Abbott Laboratories.

      ii.   **Brand.** The Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes are sold under the same brand name: Glucerna.

      iii.   **Purpose.** The Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes are intended to be consumed.

---

[75] Andrew Smith, *Request for Investigation of Deceptive Advertising of Sucralose*, U.S. RIGHT TO KNOW (Nov. 19, 2018), https://usrtk.org/wp-content/uploads/2018/11/Sucralose-FTC-letter.pdf.
[76] *Id.*
[77] *Id.*

FIRST AMENDED COMPLAINT

iv.   **Key Ingredients.** The Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes are made largely from the same ingredients, including, but not limited to sucralose, carrageenan, and maltodextrin (in Original Shakes and Snack Shakes only).

v.   **Marketing Demographics.** The Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes are marketed directly to diabetic, pre-diabetic, and generally health-conscious consumers for personal consumption.

vi.   **Representations.** The Products are labeled and advertised using the Challenged Health Claims (i.e., "to help manage blood sugar," "scientifically designed for people with diabetes," and "#1 doctor recommended brand.").

vii.   **Packaging.** The Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes are similarly packaged, including using similar styles for written content. The Products' front labeling share the same marketing claims, including brand identity and identity of the product line.

viii.   **Misleading Effect.** The misleading effect of the Challenged Health Claims on consumers is the same for the Original Shakes, Hunger Smart Shakes, Protein Smart Shakes, and Snack Shakes—consumers over-pay a premium for a product that claims to provide blood sugar management benefits, despite the inclusion of ingredients like sucralose, carrageenan, and maltodextrin (in the Original Shakes and Snack Shakes) that worsen blood sugar.

56.   The Glucerna Hunger Smart Shake Powders ("Powders"), including without limitation, the Homemade Vanilla and Rich Chocolate flavors are substantially similar to the Purchased Products as follows:

i.   **Defendant Abbott Laboratories.** The Powders are manufactured, sold, marketed, advertised, and labeled by Defendant Abbott Laboratories.

ii.    **Brand.** The Powders are sold under the same brand name: Glucerna.

iii.   **Purpose.** The Powders are intended to be consumed.

iv.    **Key Ingredients.** The Powders are made largely from the same ingredients, including sucralose.

v.     **Marketing Demographics.** The Powders are marketed directly to diabetic, pre-diabetic, and generally health-conscious consumers for personal consumption.

vi.    **Representations.** The Powders are labeled and advertised using the Challenged Health Claims (i.e., "scientifically designed for people with diabetes" and "#1 doctor recommended brand").

vii.   **Misleading Effect.** The misleading effect of the Challenged Health Claims on consumers is the same for the Powders—consumers over-pay a premium for a product that claims to provide blood sugar management benefits, despite the inclusion of ingredients like sucralose that worsen blood sugar.

**B.    Plaintiffs and Reasonable Consumers Were Misled by the Challenged Health Claims**

57.    Humans are "predominantly visual" creatures.[78] Over 70% of a human's sensory receptors are located in their eyes, which allows for people to interpret a visual scene in less than 1/10 of a second.[79] As a result, our environment caters to and prioritizes our desire to engage with visual content.[80] One area that illustrates humans' visual nature is the consumer decision-making process. Because the average consumer spends only 13 seconds deciding whether to make an in-store purchase,[81] visual elements heavily influence purchase decision. According to Dr. Mark Lang,

---

[78] *Consumer Behavior and Visual Experiences*, MOXELS, https://www.moxels.com/post/consumer-behaviour-visual-experiences (last visited Nov. 30, 2023).
[79] *Id.*
[80] *Id.*
[81] Randall Beard, *Make the Most of Your Brand's 20-Second Window*, NIELSEN (Jan. 13, 2015), https://www.nielsen.com/us/en/insights/article/2015/make-the-most-of-your-brands-20-second-windown./.

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

professor of food marketing at Saint Joseph's University, "[s]hoppers make decisions heuristically—based on shortcuts using inferences and incomplete data."[82]

58.     Labels are the chief means by which food product manufacturers convey critical information to consumers, and consumers have been conditioned to rely on the accuracy of the claims and message made on these labels.

59.     Abbott Laboratories is aware that consumers make quick decisions based largely on visual cues and so manufactures, markets, advertises, labels, packages, and sells its Products intentionally to highlight the Challenged Health Claims to indicate to consumers that the Products aid in maintaining healthy blood sugar levels generally and for those with diabetes specifically. As such, Abbott Laboratories packages and advertises the Products in a misleading and deceptive manner and does so intentionally.

60.     **False Representations on the Products' Labels.** Abbott Laboratories manufactures, markets, advertises, labels, packages, and sells the Products with the following representations: "to help manage blood sugar," "scientifically designed for people with diabetes," and "#1 doctor recommended brand," respectively.  (*See* "**Exhibits 1-5**," *supra*).

61.     On the Shakes, the section symbol after the "#1 Doctor Recommended Brand **§**" representation connects to the "**§** Scientifically Designed for People with Diabetes" statement. The labels on the Powder similarly connect these statements but using a **†** symbol. In both cases, connecting the two statements to each other doubles down on the false Challenged Health Claims and further underscores for consumers the purported suitability of the Products for diabetics. In addition to reasonably believing that the Products aid in managing blood sugar generally, consumers including Plaintiffs reasonably understand these statements to mean the Products are somehow scientifically capable of the treatment of diabetes or other health conditions, when they are not.

62.     Moreover, "scientifically designed for people with diabetes" reasonably conveys to consumers including Plaintiffs that the Products were scientifically formulated to have some mechanism of action that provides a therapeutic benefit regarding diabetes/prediabetes and blood

---

[82] *Package Downsizing Proves That Less Is Not More*, CONSUMER REPORTS (Sep. 24, 2015), https://www.consumerreports.org/cro/magazine/2015/09/packaging-downsizing-less-is-not-more/index.htm.

sugar regulation generally. In actuality, the Products contain ingredients that worsens diabetes and poses a host of health risks for diabetics. While Abbott Laboratories deceptively markets its Products as "scientifically designed for people with diabetes," the truth is that the Products harm the very individuals the Products claim to be "designed" for.

63.     The false representation on the Shake's front label "to help manage blood sugar" is followed by a † symbol, leading to this statement on the side of the Product: "Designed to help minimize blood sugar spikes in people with diabetes compared to high glycemic carbohydrates." To the extent consumers see this side-label statement, if at all, it affirms the false notion that the Products are specifically suited for people with diabetes as well as pre-diabetics and non-diabetics who want to manage their blood sugar levels generally. To the extent consumers see this side-label statement, if at all, consumers understand it to reinforce and support the Challenged Health Claims. The statement on the side label is further false and misleading to consumers because consuming sucralose has been found to cause abnormal spikes in blood sugar after consumption.[83]

64.     **Consumers Are Not Obligated to Read Back or Side Label Qualifiers or Disclaimers.** The average consumer spends only 13 seconds to make an in-store purchasing decision. That purchasing decision is heavily dependent on a product's *front* labeling. Reasonable consumers, including Plaintiffs, do not read the back label when making their purchase decisions, nor are they obligated to. Reasonable consumers, including Plaintiffs, do not expect the back label to contain information that contradicts what is claimed on a product's front label. Abbott Laboratories includes the Challenged Health Claims on the *front* of the Products' labels. (*See* "**Exhibits 1-5**," *supra*). Nowhere on the front of the Products' labels does Abbott Laboratories include additional information refuting, qualifying, or narrowing the Challenged Health Claims. Reasonable consumers, including Plaintiffs, relied on the Challenged Health Claims in purchasing the Products and should not have to decipher or investigate the Products' front label claims in order to obtain the truth.

65.     **Consumers' Reasonable Contextual Inference Based on Product Placement.** Abbott Laboratories' chosen placement of the Products in stores and on websites further enforces

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

---

[83] Pepino, *supra* note 16.

FIRST AMENDED COMPLAINT

the conclusion Abbott Laboratories wants consumers to perceive and believe the Products as treating diabetes and related health conditions. For example, on RiteAid.com, the Products are categorized under the following tabs: Home>Medicine & Health>Diabetes Management.[84] Additionally, the Products are sold physically in stores placed in the health and nutritional supplement sections adjoining aisles selling diabetes diagnostic equipment and blood glucose tests, reenforcing the message the Products are suitable for managing and treating diabetes and/or general blood sugar regulation. Consumers reasonably infer from the placement, coupled with the Challenged Health Claims, that the Products will aid in the management of blood sugar generally and especially for those with diabetes.

66.   **Consumers Reasonably Believe the Products Can Help Them Manage Their Blood Sugar.** Plaintiffs and other reasonable consumers were deceived by Abbott Laboratories into believing that the Products conform to the Challenged Health Claims. Reasonable consumers, including those with and without diabetes and pre-diabetes conditions, interpret the Challenged Health Claims to mean that the Products can aid in managing their blood sugar and/or are designed to help manage their diabetic condition. Reasonable consumers have no way of knowing, nor do they have a reason to know or believe, that the Products cannot provided the advertised benefits.

67.   Reasonable consumers, including Plaintiffs, understood that Abbott Laboratories' Products can be used to regulate, achieve, and manage normal and healthy blood sugar levels. While there are medications that may be prescribed to control blood sugar levels, and while some diabetics (typically type 1) may be prescribed insulin, all medications and treatments for diabetes and insulin resistance generally aim to manage blood sugar levels. Reasonable consumers, including Plaintiffs, understand that there are many non-prescription treatments for health conditions, including diabetes, and understand Abbott Laboratories' Challenged Health Claims as meaning that the Products are over-the-counter aids "to help manage" diabetes and blood sugar generally.

68.   **Consumers Reasonably Believe the Challenged Health Claims are Implied Health Claims.** Plaintiffs and other reasonable consumers, including those without diabetes or pre-

---

[84] See *Diabetes Management*, RITE AID, https://www.riteaid.com/shop/medicine-health/diabetes-management?Manufacturer=Glucerna.

FIRST AMENDED COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

diabetes, interpret the Challenged Health Claims to mean that the Products are nutritional shakes and powders. Specifically, Plaintiffs and other reasonable consumers understand the Products' label claims that the Products "[] help manage blood sugar," are "scientifically designed for people with diabetes" and are the "#1 doctor recommended brand" as an indication that the Products are uniquely healthy, given their doctor recommendation and their designation for people with medical conditions like diabetes. In making their purchases, Plaintiffs and other reasonable consumers, including those without diabetes or pre-diabetes, relied on Abbott Laboratories' misrepresentations of health.

69.     **Material.** The Challenged Health Claims are material to reasonable consumers, including Plaintiffs, because consumers seek healthier alternatives for foods and ingredients that will allow them to maintain their metabolic health and regulate their blood sugar levels and specifically seek healthier alternatives to sugar due to the negative connotations associated with the consumption of sugar generally and for diabetics especially. Consequently, Abbott Laboratories' Challenged Health Claims help influence consumers' decision to purchase the Products, including Plaintiffs, as set forth herein. Plaintiffs would not have purchased the Products or would have paid significantly less for them if they had known that the Products' label claims were false and misleading, that the Products cannot help in managing blood sugar generally (but in actuality can worsen it), and that the Products are not otherwise suitable for people with diabetes specifically.

70.     **Reliance.** Reasonable consumers, including Plaintiffs, viewed the Challenged Health Claims on the Products' labels prior to purchasing the Products, understood the representations to be implied health claims, and reasonably relied on the Products' Challenged Health Claims in deciding to purchase the Products.

71.     **Falsity.** The Products' Challenged Health Claims are false and deceptive because the Products cannot provide the advertised benefits.

72.     **Consumers Lack Knowledge of Deception/Fraudulence.** Consumers, including Plaintiffs, who purchased the Products, did not know, and had no reason to know, at the time of purchase, that the Products were incapable of providing the advertising benefits.

73.     **Abbott Laboratories' Knowledge.** Abbott Laboratories knew, or should have

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

known, that its Products' Challenged Health Claims were false, misleading, deceptive, and unlawful at the time that Abbott Laboratories manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Health Claims to Plaintiffs and the Class. Abbott Laboratories intentionally and deliberately used the Challenged Health Claims to cause Plaintiffs and similarly situated consumers to purchase the Products. Abbott Laboratories, as the manufacturer, had exclusive control over how the Products were marketed and labeled, and Abbott Laboratories readily and easily could have remedied the deception by stopping the use of the Challenged Health Claims to sell the Products. Abbott Laboratories deliberately chose to market the Products with the Challenged Health Claims, thereby misleading consumers into buying or overpaying for the Products. Thus, Abbott Laboratories knew, or should have known, at all relevant times, that the Challenged Health Claims mislead reasonable consumers, such as Plaintiffs, into buying the Products to attain the product attributes that Abbott Laboratories falsely advertised and warranted.

74. **Detriment.** Plaintiffs and similarly situated consumers would not have purchased the Products if they had known the Products could not provide the advertised benefits or would not have overpaid a price premium for the Products, if they had known that the Challenged Health Claims were false as labeled, claimed, promised, warranted, advertised, and represented. Accordingly, based on Abbott Laboratories' material misrepresentations and omissions, reasonable consumers, including Plaintiff, purchased the Products to their detriment by paying a price premium for falsely labeled and advertised Products.

75. The price premium attributed to Abbott Laboratories' Challenged Health Claims paid by Plaintiffs and other purchasers of the Products can be seen by comparing the Products to competitor products without similar false representations. For example, the Glucerna Original Protein Shake in chocolate costs $0.26 per fluid ounce (fl oz), which is more expensive than similar products such as the Atkins Milk Chocolate Delight Protein Shake ($.14 per fl oz), the Premier Protein Shake in chocolate ($.20 per fl oz), the Quest Protein Shake in chocolate ($.20 per fl oz), and the Slimfast Original Meal Replacement Shake in mocha cappuccino ($.19 per fl oz). These similar products contain sucralose and are labeled as containing low carbohydrate nutritional values, however these products do not claim "to help manage blood sugar," or to be "scientifically designed

40

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

for people with diabetes" or the "#1 doctor recommended brand." Abbott Laboratories capitalizes on consumers' desire for products that will help them manage their diabetes and/or blood sugar levels generally by falsely labeling and advertising its Products with the Challenged Health Claims and unjustly charging consumers a premium for advertised benefits that the Products cannot achieve.

**C.**     <u>**No Adequate Remedy at Law**</u>

76.     **No Adequate Remedy at Law**. Plaintiffs and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

    a.     **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. In addition, the statutes of limitations vary for certain states' laws for breach of warranty and unjust enrichment/restitution, between approximately 2 and 6 years. Thus, Class members who purchased the Products more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

    b.     **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes, for example, Abbott Laboratories' overall unfair marketing scheme to brand the Products with the Challenged Health Claims across a multitude of media platforms, including the Products' labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products and to take advantage of consumers' desire for products that comport with the labeling and advertising. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue).  Thus, Plaintiffs and Class members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the

41

falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

c.   **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiffs and members of the Class because Abbott Laboratories continues to misrepresent the Products as alleged herein. Injunctive relief is necessary to prevent Abbott Laboratories from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures, is necessary to dispel the public misperception about the Products that have resulted from years of Abbott Laboratories' unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' labeling and advertising is not true and providing accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label such as stating that the Products are not suitable for people with diabetes and/or should not be used as a tool to manage blood sugar. Injunctive relief prohibiting sale of the Products using the phrases "suitable for people with diabetes" and "helps manage blood sugar" is likewise warranted. An injunction requiring affirmative disclosures to dispel the public's misperception and to prevent the ongoing deception and repeat purchases based thereon, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiffs are *currently* unable to accurately quantify the damages caused by Abbott Laboratories' future harm, because discovery and Plaintiffs' investigation has not yet completed, rendering injunctive relief all the more necessary. For example, because the court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

purchasing practices, prices of past/future Product sales, and quantities of past/future Product sales.

    d. **Public Injunction.** Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

    e. **Procedural Posture—Incomplete Discovery & Pre-Certification.** This is an initial pleading in this action and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiffs' individual claims and any certified class. Plaintiffs therefore reserves their right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiffs and/or any certified class. Such proof, to the extent necessary, will be presented prior to trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## V.    CLASS ALLEGATIONS

77. **Class Definition.** Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated. The Class which Plaintiffs seek to represent is defined as follows:

> All residents of the United States who, within the four years prior to the filing of this Complaint, purchased the Products for purposes other than resale (the "Nationwide Class"); and

> All residents of California who, within four years prior to the filing of this Complaint, purchased the Products for purposes other than resale (the "California Subclass").

> ("Nationwide Class" and "California Subclass," collectively, the "Class")

78. **Class Definition Exclusions.** Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

(iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

79.    **Reservation of Rights to Amend the Class Definition.** Plaintiffs reserve the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

80.    **Numerosity.** The Class is so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands or hundreds of thousands throughout California and the United States. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

81.    **Common Questions Predominate.** Common questions of fact and law predominate over questions which may affect individual class members, including the following:

a.    Whether Defendant's conduct constitutes an unfair method of competition or unfair or deceptive act or practice in violation of California Civil Code Section 1750, *et seq.*;

b.    Whether Defendant used deceptive representations in connection with the sale of the Product in violation of California Civil Code Section 1750, *et seq.*;

c.    Whether Defendant represented the Products to have characteristics that they do not have in violation of California Civil Code Section 1750, *et seq.*;

d.    Whether Defendant advertised the Products with the intent not to sell them as advertised in violation of California Civil Code Section 1750, *et seq.*;

e.    Whether Defendant's advertising is untrue or misleading within the meaning of Business and Professions Code Section 17500, *et seq.*;

f.    Whether Defendant knew or by the exercise of reasonable care should have known its advertising was and is untrue or misleading in violation of Business and Professions Code Section 17500, *et seq.*;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

g.     Whether Defendant made false and misleading representations in its advertising and labeling of the Product in violation of Business and Professions Code Section 17500, *et seq.*;

h.     Whether Defendant's conduct is an unfair business act or practice within the meaning of Business and Professions Code Section 17200, *et seq.*;

i.     Whether Defendant's conduct is a fraudulent business act or practice within the meaning of Business and Professions Code Section 17200, *et seq.*;

j.     Whether Defendant's conduct is an unlawful business act or practice within the meaning of Business and Professions Code Section 17200, *et seq.*;

k.     Whether Defendant's conduct constitutes a breach of warranty;

l.     Whether Defendant was unjustly enriched by its deceptive conduct;

m.     Whether Plaintiffs and the Class paid more money or a premium amount for the Products than they actually received; and

n.     How much more money or premium amount Plaintiffs and the Class paid for the Products than they actually received.

82.     **Typicality.** Plaintiffs' claims are typical of the claims of the Class Members they seek to represent because Plaintiffs, like the Class Members, purchased Defendants' misleading and deceptive Products. Defendants' unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries arising out of Defendants' conduct, and Plaintiffs will fairly and adequately represent and protect the interests of the Class.

83.     **Adequacy**. Plaintiffs are adequate representatives of the Class they seek to represent because their interests do not conflict with the interests of the Class Members Plaintiffs seek to represent. Plaintiffs will fairly and adequately protect Class Members' interests and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

84.     **Superiority and Substantial Benefit:** A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual

45

litigation would make it impracticable or impossible for the Class to prosecute their claims individually.

85.     **Manageability.** The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Abbott Laboratories' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

86.     **Injunctive/Equitable Relief.** Defendant Abbott Laboratories has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

87.     **Inconsistent Rulings.** Absent a class action, Defendant Abbott Laboratories will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

88.     Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendant Abbott Laboratories' false representations and material omissions. Plaintiffs and the Class purchased the Products under the false belief that the Products could provide the advertised benefits. Plaintiffs and the Class relied upon Defendant's labeling, packaging, and advertising claims and would not have purchased the Products, or would paid significantly less for the Products, if they had known that the Products could not provide the advertised benefits.

89.     On March 22, 2023, written notice was sent to Abbott Laboratories via certified U.S. mail pursuant to Civil Code Section 1750, *et seq*., which set forth the claims of the Class concerning the Products' false, misleading, deceptive, unlawful, unfair, and fraudulent claims.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**CAUSES OF ACTION**

**COUNT ONE**

**Violation of California Consumers Legal Remedies Act,**

**(California Civil Code 1750, *et seq*.)**

**(*On Behalf of the California Subclass*)**

90.     **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

91.     **California Subclass.** Plaintiffs brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

92.     **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

93.     **Goods/Services.** The Product are "goods," as defined by the CLRA in California Civil Code §1761(a).

94.     **Defendant.** Defendant is a "person," as defined by the CLRA in California Civil Code §1761(c).

95.     **Consumers.** Plaintiffs and members of the Class are "consumers," as defined by the CLRA in California Civil Code §1761(d).

96.     **Transactions.** The purchase of the Products by Plaintiffs and members of the Class are "transactions" as defined by the CLRA under California Civil Code section 1761(e).

97.     **Violations of the CLRA.** Defendant violated the following sections of the CLRA by advertising and selling the Products to Plaintiffs and the Class through the false, misleading, deceptive, and fraudulent Challenged Health Claims:

    a.  Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which they do not have."

    b.  Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another."

    c.  Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

98. **Knowledge.** Defendant's uniform material representations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its representations and omissions were untrue and misleading.

99. **Malicious.** Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiffs, to increase the sales of the Products.

100. **Plaintiff Could Not Have Avoided Injury.** Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Defendant suppressed and failed to disclose, and Plaintiffs and members of the Class would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

101. **Causation/Reliance/Materiality.** Plaintiffs and the Class suffered harm as a result of Defendant's violations of the CLRA because they purchased the Products relying on the Challenged Health Claims in deciding to purchase the Products. The Challenged Health Claims were a substantial factor in Plaintiffs' decision to purchase the Products. The Challenged Health Claims were material because a reasonable consumer who desires to regulate their blood sugar and/or manage their diabetes would consider them important in deciding whether to purchase the Products.

102. **Section 1782(d) Notice Requirement.** Pursuant to California Civil Code, section 1782, on March 22, 2023, Plaintiff Steven Prescott, on Plaintiffs' behalf and on behalf of members of the Class, notified Defendant of its alleged violations of the CLRA via U.S. Certified Mail.

103. **Causation/Damages (Section 1782(d)).** As a direct and proximate result of Defendant's misconduct in violation of the CLRA, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.

104. **Injunction.** Given that Defendant's conduct violated California Civil Code section 1780, Plaintiffs and members of the Class are entitled to seek, and do hereby seek, injunctive relief

48

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

to put an end to Defendant's violations of the CLRA. Plaintiffs have no adequate remedy at law. Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiffs and the Class.

<u>COUNT TWO</u>

**Violation of California False Advertising Law,**

**(Business & Professions Code 17500, *et seq*.)**

**(*On Behalf of the California Subclass*)**

105.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

106.   **California Subclass.** Plaintiffs brings this claim individually and on behalf of the California Subclass who purchased the Product within the applicable statute of limitations.

107.   **FAL Standard.**   The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

108.   **False & Material Challenged Health Claims Disseminated to the Public.** Defendant violated § 17500 when it advertised and sold the Products through unfair, deceptive, untrue, and misleading Challenged Health Claims disseminated to the public through the Products' labeling, packaging, in-person and online store product placement, and advertising. These representations were false because the Products did not conform to them. The representations were material because they are likely to mislead a reasonable consumer into purchasing the Products.

109.   **Knowledge.** In making and disseminating the Challenged Health Claims alleged herein, Defendant knew or should have known that the representations were untrue or misleading and acted in violation of § 17500.

110.   **Intent to sell.** Defendant's conduct was specifically designed to induce reasonable consumers, like Plaintiffs and the Class, to purchase the Products.

111.   **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts

49

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    paid for the Products, and any interest that would have accrued on those monies, in an amount to be

2    proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of the FAL in damages,

3    restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said

4    monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future

5    harm that will result.

6                                **COUNT THREE**

7                   **Violation of California Unfair Competition Law,**

8            **(Business & Professions Code Section 17200, *et seq.*)**

9                       ***(On Behalf of the California Subclass)***

10        112.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all

11    allegations contained in this complaint, as though fully set forth herein.

12        113.   **California Subclass.** This cause of action is brought pursuant to Business and

13    Professions Code Section 17200, *et seq.*, on behalf of Plaintiffs and the California Subclass who

14    purchased the Product within the applicable statute of limitations.

15        114.   **The UCL.** California Business & Professions Code, sections 17200, *et seq.* (the

16    "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall

17    mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or

18    misleading advertising."

19        115.   **False Advertising Claims.** Defendant, in its advertising, labeling, and packaging of

20    the Products, made misleading statements and fraudulent omissions regarding the quality and

21    characteristics of the Products—specifically, Defendant labeled, advertised, and markets the

22    Products as nutritional products that "[] help manage blood sugar," are "scientifically designed for

23    people with diabetes" and are the "#1 doctor recommended brand," despite the Products' inclusion

24    of sucralose and other additives.

25        116.   **Defendant's Deliberately Fraudulent Marketing Scheme.** Defendant does not have

26    any reasonable basis for the claims about the Products made in Defendant's advertising and on

27    Defendant's packaging or labeling of the Products because the Products cannot provide the

28    advertised benefits. Defendant knew and continues to know that the Products cannot provide the

advertised benefits (i.e., diabetes care and blood sugar management), though Defendant intentionally advertised and marketed the Products to deceive reasonable consumers into believing that they could achieve the advertised benefits.

117. **Misleading Labeling, Advertising Cause Purchase of Product.** Plaintiffs and the Class purchased the Products relying on the Challenged Health Claims in deciding to purchase the Products. Defendant's labeling and advertising of the Products using the Challenged Health Claims, and continues to lead to reasonable consumers, including Plaintiffs, believing that the Products can truly provide diabetes and blood sugar management benefits, when they cannot.

118. **Injury in Fact.** Plaintiffs and the Class have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendant's Challenged Health Claims—namely, Plaintiffs and the Class lost the money they paid for the Products they purchased from Defendant.

119. **Conduct Violates the UCL.** Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

120. **No Reasonably Available Alternatives/Legitimate Business Interests.** Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

121. **Business Practice.** All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue daily until Defendant voluntarily alters its

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    conduct or Defendant is otherwise ordered to do so.

2        122.   **Injunction.** Pursuant to Business and Professions Code Sections 17203 and 17535,

3    Plaintiffs and the Class seek an order from this Court enjoining Defendant from continuing to

4    engage, use, or employ its practice of labeling the Products as "to help manage blood sugar,"

5    "scientifically designed for people with diabetes," and "#1 doctor recommended brand" when they

6    are not. Plaintiffs and the members of the Class also seek an order requiring Defendant to disclose

7    such information, and/or precluding Defendant from selling the Products.

8        123.   **Causation/Restitution.** As a direct and proximate result of Defendant's misconduct

9    in violation of the UCL, Plaintiffs and the Class were harmed in the amount of the purchase price

10   they paid for the Products. Plaintiffs and the Class have suffered and continue to suffer economic

11   losses and other damages including, but not limited to, the amounts paid for the Products, and any

12   interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly,

13   Plaintiffs seek restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the

14   Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent

15   ongoing and future harm that will result.

16                              ***"Unfair" Prong***

17       124.   **Unfair Standard.** Under the UCL, a challenged activity is "unfair" when "any injury

18   it causes outweighs any benefits provided to consumers and the injury is one that the consumers

19   themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal.

20   App. 4th 1394, 1403 (2006).

21       125.   **Injury.** Defendant's action of mislabeling the Products with the Challenged Health

22   Claims does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who

23   do not receive Products commensurate with their reasonable expectations, receive a Product of

24   lesser standards than what they reasonably expected to receive, and are exposed to increased health

25   risks. Consumers cannot avoid any of the injuries caused by Defendant's deceptive labeling and

26   advertising of the Products. The injuries caused by Defendant's deceptive labeling and advertising

27   outweigh any benefits.

28       126.   **Balancing Test.** Some courts conduct a balancing test to decide if a challenged

activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

127.   **No Utility.** Defendant's conduct of falsely labeling and advertising the Products as nutritional drinks that can "help manage blood sugar," "scientifically designed for people with diabetes," and "#1 doctor recommended brand" have no utility and rather harms purchasers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of harm.

128.   **Legislative Declared Policy.** Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

129.   **Unfair Conduct.** Defendant's labeling and advertising of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct. Defendant's representations and omissions constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

130.   **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Products.

131.   **Defendant's Wrongful Conduct.** All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

132.   **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products as nutritional products that can "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand."

133.   **Causation/Restitution.** Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for Products that could supposedly help with diabetes care and blood sugar management when they cannot. Plaintiffs

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

and the Class would not have purchased the Products if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Fraudulent" Prong*

134.    **Fraud Standard.** The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

135.    **Fraudulent & Material Challenged Health Claims.** Defendant sold the Products as nutritional products that "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand." These representations were deceptive, and Defendant knew or should have known of its deception. The representations are likely to mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

136.    **Fraudulent Business Practice.** As alleged herein, the representations by Defendant constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

137.    **Reasonable and Detrimental Reliance.** Plaintiffs and the Class reasonably and detrimentally relied on the labeling on the Products to their detriment in that they purchased the Products without receiving the advertised benefits.

138.    **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Products.

139.    **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

140.    **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products as nutritional products that "[] help manage blood sugar," are

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

"scientifically designed for people with diabetes," and are the "#1 doctor recommended brand."

141. **Causation/Restitution.** Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiffs and the Class paid for a product that they believed could supposedly help with diabetes care and blood sugar management when it cannot.

142. Plaintiffs and the Class would not have purchased the Products if they had known the truth. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Unlawful" Prong*

143. **Unlawful Standard.** The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

144. **Violations of CLRA and FAL.** Defendant's labeling of the Products, as alleged herein, violates California Civil Code sections 1750, *et seq.* and California Business and Professions Code sections 17500, *et seq.* as set forth below in the sections regarding those causes of action.

145. **Additional Violations.** Defendant's conduct in making the deceptive representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendant's representations of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, and 1711, as well as the common law.

146. **Unlawful Conduct.** Defendant's packaging, labeling, and advertising of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendant knew or should have known of its unlawful conduct.

147. **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

have refrained from selling the Products.

148.   **Business Practice.** All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

149.   **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiffs and the Class seek an order from this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products as nutritional products that "[] help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand."

150.   **Causation/Restitution.** Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiffs and the Class paid an unwarranted premium for the Products. Plaintiffs and the Class would not have purchased the Products if they had known that Defendant purposely deceived consumers into believing that the Products could supposedly help with diabetes care and blood sugar management when they cannot.

151.   Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT FOUR

### Breach of Express Warranty

#### (*On Behalf of the Nationwide Class and California Subclass*)

152.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

153.   **Nationwide Class and California Subclass.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass who purchased the Product within the applicable statute of limitations.

154.   **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Defendant, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

56

advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs and members of the Class and Defendant—to wit, that the Products, among other things, could provide the advertised benefits.

155. **Breach of Warranty.** Contrary to Defendant's warranties, the Products do not conform to the Products' representations of nutritional products that are made "to help manage blood sugar," are "scientifically designed for people with diabetes," and are the "#1 doctor recommended brand" and, therefore, Defendant breached its warranties about the Products and their qualities.

156. **Causation/Remedies.** As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

## COUNT FIVE

### Unjust Enrichment/Restitution

### (*On Behalf of the Nationwide Class and California Subclass*)

157. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

158. **Nationwide Class and California Subclass.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass who purchased the Product within the applicable statute of limitations.

159. **Plaintiff/Class Conferred a Benefit.** By purchasing the Products, Plaintiffs and members of the Class conferred a benefit on Defendant in the form of the purchase price of the Products.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

160. **Defendant's Knowledge of Conferred Benefit.** Defendant had knowledge of such benefit and Defendant appreciated the benefit because, were consumers not to purchase the Products, Defendant would not generate revenue from the sales of the Products.

161. **Defendant's Unjust Receipt Through Deception.** Defendant's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent, misleading, and deceptive representations.

162. **Causation/Restitution.** As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment and relief on all causes of action as follows:

a. **Certification:** For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel;

b. **Declaratory Relief:** For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

c. **Injunction:** For an order requiring Defendant to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

FIRST AMENDED COMPLAINT

d. **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e. **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f. **Pre-/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and,

g. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues and causes of action so triable.

DATED: December 22, 2023                 **CLARKSON LAW FIRM, P.C.**

/s/ Bahar Sodaify
Shireen M. Clarkson, Esq.
Bahar Sodaify, Esq.
Alan Gudino, Esq.
Kelsey Elling, Esq.
Ryan Ardi, Esq.

*Attorneys for Plaintiffs and the Putative Class*

FIRST AMENDED COMPLAINT